No. 13,089.

SANTO RUSSO vs. MORRIS BUILDING AND LAND IMPROVEMENT ASSOCIATION, LIMITED.

SYLLABUS.

It appearing from the evidence that no fault is attributable to the proprietor of a building in the construction of a passenger elevator, or in the operation thereof, he must be released from the payment of damages to a passenger who has suffered injury, not having been guilty of either fault or negligence.

ON REHEARING.

It is the duty of the party operating an elevator to see that the passengers are on, and to give them sufficient time to adjust themselves before starting it. If the elevator be started at once with full speed before a passenger has had time to place himself securely on his feet and he is thereby thrown off his balance and injured, the carrier is responsible for the injury.

APPEAL from the Civil District Court, Parish of Oreans—*Monroe, J.*

*L. L. Labatt* and *Benjamin Rice Forman* for Plaintiff, Appellee.

*Clegg & Quintero* for Defendant, Appellant.

On the rehearing granted by Nicholls, C. J.

The opinion of the court was delivered by

WATKINS, J.   This is an action for the recovery of five thousand dollars damages for personal injuries that plaintiff alleges he sustained in one of the defendant's elevators in the Hennen building, in the city of New Orleans, by reason of the fault and negligence of its servants and agents.

The cause was tried by a jury, who rendered a verdict in favor of the plaintiff, for one thousand dollars, by a majority of nine jurors in favor of the plaintiff, to three in favor of the defendant; and a motion for a new trial, on the ground that the verdict of the jury is contrary to the law and evidence, having been overruled, the defendant prosecutes this appeal.

In this court, the plaintiff filed an answer to the appeal, and requested that the allowance in his favor be increased to five thousand dollars, the amount originally demanded.

The averment of the petition is, substantially, that the defendant owns and maintains a large office building in the city of New Orleans, known as the Hennen building, in which four elevators are operated, and which it holds out to the public as safe, and to which those having business in the building are invited as a safe means of conveyance from one floor thereof to another.

That on the 10th of November, 1897, petitioner having business in one of the offices of said building, entered one of said elevators to be carried to one of the upper floors, when the servant, agent and vice-principal of the defendant operating same, "was guilty of gross negligence and carelessness in the operation of said elevator; his negligence consisting *first*, in starting the said elevator too quickly, and before he had time to fully enter same; and *second*, in carelessly knocking against petitioner, whereby he lost his balance."

In addition to the foregoing charge of fault and negligence, petitioner makes the further and additional charge, "that said elevator was carelessly and negligently constructed in not having an inside gate or door which would prevent any passenger from striking any one of the sills of the shaft of the building; and that by reason of * * * the negligence of the defendant in having an unsafe construction into which he, as one of the public, was invited, he had his arm broken by being brought into violent contact with the sill of the floor of the building, as the elevator passed it, whereby he has been crippled for life, &c."

He alleges that he was altogether without fault or negligence, and did not cause or contribute to the accident in any way.

The answer is a general denial, coupled with the specific averment, that the defendant was guilty of no negligence either in the construction or operation of its elevator; and, further, that its elevator "is of

modern device and is reasonably safe, and has daily carried hundreds of passengers safely and conveniently."

It alleges that plaintiff's injury was inflicted by and through his own fault, and by his own awkwardness, or was the result of an unforeseen accident, for which it is in no way responsible.

It is made quite evident from an examination of the evidence, that the plaintiff's left arm was so seriously mutilated that same has been rendered comparatively useless for life; and, if the defendant is shown to have been at fault, either in the construction, or operation of its elevator, it should be held responsible in damages therefor.

Counsel for defendant attracts our attention to the fact that the first jury who tried the case found a verdict for the defendant, and the second one only found a verdict for one thousand dollars, by a majority of nine to three; and that, considering the nature and extent of plaintiff's injuries, these circumstances necessarily imply a grave doubt as to the defendant being in fault, and that the bare existence of a doubt should have resulted in a verdict in defendant's favor.

With regard to the alleged faultiness of the construction of the elevator, we find no evidence in the record, and we may safely assume that the charge of fault on that score was abandoned in the lower court, notwithstanding it was renewed in argument and in brief in this court.

The point made in the argument on this score, to the effect that the gate which closes the way for the entrance and exit of passengers was attached to the wall outside of the elevator, and not to the elevator, thereby leaving an open space between the elevator and the wall sufficiently great to admit an arm or leg, and, therefore, it was a constant menace to the safety of passengers, cannot be sustained in view of the fact that it had been successfully operated in that condition during a series of years, without other accidents than the one complained of, notwithstanding three or four thousand of passengers had been daily carried up and down thereupon.

It is claimed that the elevators in the defendant's office building, which is several stories in height, are of the latest modern pattern, and of the most improved design of any in the country; and the evidence discloses nothing to the contrary.

We may, with perfect satisfaction, pass from this branch of the case, to the examination of the charge of the defendant's culpable fault and negligence in the manner in which its elevator was operated on the day the accident happened.

It will, in our opinion, be the better course to first examine the testimony with regard to the manner in which the accident happened, as it may prove the best method of enabling us to solve the question under investigation.

The testimony given by the messenger boy who was in the elevator at the time the accident happened is to the effect that "he came into the Hennen Building, and just as he got in the elevator, these two men came in behind (him)"—referring to the plaintiff and his companion.

"I stood in the corner, opposite the elevator boy, and these two men stood in the middle. The elevator started off and went up fast; it went so fast that the man went just right off of his feet, and when it hit the second floor, the elevator boy stopped, and brought the man down, and I jumped out of the elevator.

"Q.—Where was his arm caught?

"A.—Between the floor of the elevator and that gate there.

"Q.—Between the floor of the elevator and what else?

"A.—Between the railing—a fence like.

"Q.—Was the gate on the elevator, or shaft?

"A.—On the shaft.

"Q.—Do you know what it was that made Santo Russo fall over?

"A.—No, sir; it looked like the elevator went so fast that it made him fall over. It seemed so, because he went down so quick.

"Q.—Did it start slow and gentle, or fast and quick?

"A.—Fast and quick.

"Q.—How high had the elevator got up when this man's arm was hurt?

"A.—To the second floor, and then it went right down again.

"Q.—You mean the floor above the ground?

"A.—Yes, sir.

*       *       *       *       *       *       *

"Q.—How many people were in the elevator?

"A.—Me and these two men, and the elevator man.

"Q.—Santo Russo, and the man that came with him?

"A.—Yes, sir; and me and the elevator man.

*       *       *       *       *       *       *

"Q.—Do you remember whether that elevator started any different on that day from what it usually does?

"A.—No, sir; no difference; but it seems to me that that was the first

time that this man was in the elevator. As soon as the elevator started he went down, like that, the elevator went so quick.

"Q.—You are sure he fell down?

"A.—Yes, sir.

"Q.—You didn't fall?

"A.—No, sir.

"Q.—Did the other man fall that was with him?

"A.—No, sir.

"Q.—Did this man throw up his hands?

"A.—No, sir.

"Q.—Where was he standing—about the middle of the elevator?

"A.—Yes, sir.

"Q.—Where was the elevator boy standing?

"A.—Just like where he pulls the rope.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"Q.—Show the judge and jury how he was standing. Take this door to be the elevator, and go like you did when you went in that day?

"A.—I went in this way; and then these two men came in the elevator, and as the elevator started, he fell."

The man who was the companion of the plaintiff, and went into the elevator with him, makes the statement that he and brother-in-law, the plaintiff, "went into the Hennen Building, and after I went in—I first went in, and then he followed; and a moment after we went into the elevator, the first I knew he had his arm caught."

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"Q.—Describe how and in what manner Santo Russo got hurt?

"A.—Soon after I came in, I looked to see where he was, and I saw his arm caught, immediately after I went in.

"Q.—Where was he caught?

"A.—Between the floor of the elevator and the top of the door.

"Q.—How did his arm get in between the left of the elevator and the top of the door?

"A.—He was near the door, and I saw him with his arm caught between the elevator and the top of the door. I was very much afraid when I saw him thus.

"Q.—How long after you and he got in was it before the elevator started?

"A.—Immediately..

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"Q.—What was it that caused Santo Russo to get his arm caught?

"A.—He didn't get enough time to come into the elevator.

"Q.—Who didn't give enough time?

"A.—The man who was working it.

"Q.—Working the elevator?

"A.—Yes, sir.

"Q.—Did the car go up slow or quick?

"A.—As fast as possible; like lightning.

"Q.—Did Santo Russo keep standing up, or did he fall?

"A.—I had no time to see whether he was straight, or whether he fell. I saw his arm caught; that was the first thing I saw, and I told the man to descend—go down immediately. It didn't take one minute to go up to the first floor.

"Q.—Tell the jury exactly what it was that caught Santo Russo's arm?

"A.—The reason was that he didn't have time enough to go into the elevator, and immediately his arm was caught.

"Q.—Where was his arm?

"A.—As he came in, near the door, I saw immediately his arm caught near the door—I saw his arm caught immediately.

"Q.—Was the door that he is speaking about on the shaft or on the elevator car?

"A.—It is a door on the floor. It took place quick, suddenly—immediately. I saw him—that was the time I saw him fall—and I told the man immediately to go down, because he was dead.

"Q.—In what part of the elevator car was it that Santo Russo's arm was caught?

"A.—On the right hand side.

"Q.—On the right hand side, facing which way?

"A.—Looking towards Carondelet street—on the side towards Carondelet street, as the man on the other side is where he was caught.

"Q.—Then it was on the right hand side as you go in?

"A.—Yes, sir. It took place suddenly. As soon as I saw him come in, he immediately fell, and the man immediately descended; came down in the elevator, but there was nothing to do; it took place so suddenly, I could not notice everything; and immediately a lot of people came around.

"Q.—What portions of the apparatus, including the car and the shaft, was it that crushed Santo Russo's arm?

"A.—Near the door itself."

The statement of the plaintiff is, that his brother-in-law, who accompanied him to the Hennen Building, went into the elevator first, and that he followed him. That he didn't have time to go in entirely, and had placed one foot inside, and as he was bringing the other foot in, the elevator started, and he was caught—his arm became caught between the door and the floor of the elevator.

"Q.—How could your arm get between the door of the elevator and the floor?

"A.—As my second foot was in—in the elevator—and in the shock which happened as the elevator started, I fell back, and the arm became caught.

"Q.—Caught between what?

"A.—The gate of the second floor. I think it was in the door. I can't say exactly, because I know my arm was caught. The way my head was, I could not exactly describe what portion it was caught in.

    \*     \*     \*     \*     \*     \*     \*

"Q.—How came it that you got your arm in such a position that it caught between the floor of the elevator and some part of the shaft?

"A.—Because he did not give me time to come into—completely into the elevator.

    \*     \*     \*     \*     \*     \*     \*

"Q.—(To the interpreter)—The witness not speaking English, delivered his testimony through an interpreter. Ask him if he had both feet in the elevator when it started?

"A.—I had one foot in, and the other was in the act of being planted down when the elevator went up. I was in the act of going in.

"Q.—Then his face was to the rear of the elevator—was that his position?

"A.—Yes, sir; my face was turned about towards where the employee was.

"Q.—Did you go into the elevator face foremost, or sideways?

"A.—I was sought of sideways. My right foot went in first, and my left followed. It was not exactly front, but in the act of walking in.

"Q.—Then it is not true that he was standing in the middle of the elevator, and had turned around facing the door?

"A.—No, sir; I was turned towards the door. I stood near the door, at the front of the door.

Santo Russo vs. Improvement Association, Ltd.

"Q.—Then he was not entirely in this elevator when the boy started it?

"A.—I was in; but, at the same time, I was not steady; my right foot was down on the elevator (floor), but the left foot was not yet planted on the floor, and I was in the act of putting it down.

"Q.—Well, then, ask him if the elevator man gave him a chance to come into the elevator?

"A.—He gave me time to put in my right foot, but I was putting in my left foot when he started the elevator, and he didn't give me a chance to turn.

"Q.—Then, he didn't entirely enter the elevator when it started?

"A.—I would have gone in the elevator, but it was not steady.

"Q.—Ask him distinctly please,  *  *  *  whether he was inside the elevator when it started?

"A.—My body was inside the elevator, but I was not steady.

    *        *        *        *        *        *        *  ·

"Q.—Ask him if he is quite sure that he had both feet in the elevator when it started, yes or no?

"A.—I had the first foot, the right foot, in the elevator, and I was in the act of placing down the second foot.

"Q.—Then he was inside the elevator?

"A.—The left foot was inside, but it was not placed down on the floor."

It may be well, just here, to observe that the witnesses had been placed under rule at the first trial, and each one was separately interrogated; but, at the second trial, the plaintiff was excepted from the operation of that rule, and counsel for defendant objected to his testimony being heard; but this exception being overruled by the judge, he retained a bill of exceptions thereto.

In this court, counsel refers to the circumstances without criticism of the ruling of the court—but on the contrary confessing its correctness—but he argues therefrom, that the plaintiff made different statements of fact from those he made upon the former trial, and insists that same has the effect of impairing his credibility.

"Q.—Did you fall with your face down, or on your back?

"A.—I didn't fall; I remained stuck—caught by the arm.

"Q.—Then you didn't go down at all?

"A.—I didn't fall; I remained caught."

The foregoing is the substantial testimony in favor of the plaintiff.

The operator who had charge of the elevator on the day of the accident, was interrogated on the part of the defendant, and his statement is that he has been engaged in that employment for a little over three years. He says that his position in operating the elevator is on the right hand side.

The following is a portion of his interrogation:—

"Can you close the door when a man is entering the elevator?

"A.—No, sir.

"Q.—Is it possible?

"A.—No, sir.

"Q.—Why?

"A.—Because he would be in the way of the door.

"Q.—Having got that well understood, now tell the court and jury about the accident that happened to Mr. Russo?

"A.—Well, I was standing in the elevator at my place, and two men and a boy came in the elevator; and the two men stood behind, and the boy opposite me, and I looked to see if it was time to start, and as it was time to start, I closed the door, and I started the elevator, and looked around to enquire where the passengers were going—what floors; and I saw the stout man fall, and I immediately stopped the elevator, and I saw the man with his arm crushed at the ceiling of the second floor, between the flooring of the elevator and the ceiling.

"Q.—Where was the boy, James Devine, standing?

"A.—He was standing alongside, on the left hand side of the elevator.

"Q.—In the corner?

"A.—Yes, sir.

"Q.—Where was Santo Russo standing when you started the elevator?

"A.—Santo Russo was standing about the center of the elevator, a little behind me.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"Q.—Which one got in first, the boy or those two Italians?

"A.—Well, if I am not mistaken—I am quite sure, that the Italians got in first.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"Q.—Where did you say the boy stood?

"A.—He stood almost alongside of me, opposite the end of me.

"Q.—Didn't he stand behind you?

"A.—No, sir.

"Q.—Where did the men stand—those two Italians?

"A.—They stood behind. The stout man stood almost behind, and the other opposite me, almost beside me."

The foregoing is the testimony on the part of the defendant.

An examination and careful consideration of all the evidence on both sides, has impressed us with the belief that the cause of the accident was the plaintiff's unsteadiness after entering the car, or his unpreparedness for the quick movement attending its rapid elevation.

The substance of the testimony of all of the witnesses is, that the plaintiff was standing in the car at the time it started, and that by its rapid motion, he was somewhat staggered, and evidently lost his balance and fell, or was in the act of falling when the car had reached the second floor; and by this means his arm was brought in contact therewith, and the injury resulted.

The statement of the plaintiff is somewhat confused, and he seems to have no definte recollection as to the circumstances under which the accident occurred.

The evidence clearly shows that he had completely entered the car and the door had been closed by the operator after him; and the testimony of the operator is to the effect, that it would have been impossible for him to have closed the door, unless the plaintiff had gotten completely in the car.

The plaintiff's theory, that he had not entirely entered the car at the time it was started, is contradicted by the operator in regard to the closing of the door; and his testimony is undoubtedly true, for the plain reason that the door had to be closed before the car was started. For, had the door been left open at the time the car was set in motion, there would have been, undoubtedly, criminal negligence on his part; but that is not contended for by counsel for the plaintiff.

In regard to the sudden and rapid movement of the elevator, the complaint of the plaintiff is not supported by the evidence.

The engineer and machinist—a man of fifteen years experience—as a witness states that he has had charge of the Hennen Building power-house and engine for more than a year prior to the accident; and that the elevator was in first class order. That he understands the care and management of elevators professionally; that such is his business.

He says the speed of the elevator "is regulated by a centrifugal ball-governor, and so many turns of that ball-governor expands it and throws

it against a belt, and throws out safety catches, and they can't go over that speed. If they do, out she goes."

"Q.—Who fixes the speed?

"A.—Between me and the inspector of the elevators.

"Q.—Can the elevator boy or man regulate the speed of the elevator?

"A.—Not past the excess, at full speed. That is the limit of the elevator man's power. He might open it half way and crawl, but at full speed he can go no faster.

"Q.—That speed is determined by whom?

"A.—By the engineer in charge and the inspectors—three companies have inspectors.

"Q.—What was the maxim speed of November 9th, 1897?

"A.—It is—we always keep that at a standard of one hundred and fifty feet.

"Q.—A second?

"A.—No, sir; a minute.

"Q.—That elevator cannot move faster than one hundred and fifty feet a minute?

"A.—No, sir.

"Q.—The elevator boy cannot send it up any faster, no matter what he does?

"A.—No, sir. If he goes past that, he locks himself in the shaft, and stops instantly.

"Q.—Is that a reasonable and safe rate of speed?

"A.—Yes, sir.

"Q.—Will the elevator start with that speed regulation—or that speed maximum, when it starts, will it start with a jerk, or start easily and safely?

"A.—From a standstill to that velocity, it is not an easy, gradual motion, but it starts right off at full speed.

"Q.—What has been your experience and observation with regard to that in the Hennen Building?

"A.—We have had no complaints about that.

"Q.—Is it perfectly safe and reasonable?

"A.—Yes, sir.

      *       *       *       *       *       *       *

"Q.—Have you seen other elevators?

"A.—Yes, sir.

"Q.—Where?

"A.—I have seen elevators in different cities; New York in the high buildings. I have seen Otis elevators in Chicago, St. Louis and New York, and I have seen the electric elevators.

"Q.—Were the elevators in use in the Hennen Building now, and on the 9th of November, the equal of any of the elevators you have seen?

"A.—Yes, sir.

"Q.—Are they modern in their type and device, and the best your science knows?

"A.—At the time, yes. At the last date, they were the latest modern model.

"Q.—Can the elevator boy by manipulating the rope in the elevator, or by any other act of his, increase the speed of that elevator beyond that which has been determined by the inspector and the engineer?

"A.—No, sir.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"Q.—There are four elevators in that building?

"A.—Yes, sir.

"Q.—Very large traffic?

"A.—Yes, sir.

"Q.—Three or four thousand people every day?

"A.—Thirty-five hundred is about the average.

&ast;          &ast;          &ast;          &ast; .          &ast;          &ast;          &ast;          &ast;

"Q.—What power is used in the Hennen Building?

"A.—Hydraulic pressure."

On the foregoing testimony, and which is not contradicted, we feel safe in saying that no fault is attributable to the operator of the elevator. The movement of the elevator is necessarily sudden and rapid, and it must needs be so, in order to transport daily up and down between three and four thousand passengers.

There is nothing to show that the operator acted differently on that day of the accident, from what he had done before, and customarily during the entire period of his service.

The proof shows that since the elevator has been in operation in the defendant's building, no other similar accident has ever occurred, or any complaint of its management or movement been made by any one.

We are prepared to concede that a most unfortunate accident happened to the plaintiff, and totally to his surprise, no doubt; and as a result thereof, he will be a cripple for life; but we do not find from the

evidence that the defendant was in fault either in the construction or operation of its elevator.

This being the case, we feel bound to reverse the judgment appealed from.

It is therefore ordered and decreed that the verdict of the jury and the judgment thereon based, are annulled and set aside; and it is ordered and decreed that there be judgment in favor of the defendant, rejecting the plaintiff's demands at his cost in both courts.

BREAUX, J., recused.


## ON REHEARING.


NICHOLLS, C. J.    In defendant's brief counsel say:

"Can the obligation and duty of the defendant be better stated than has been done by Judge Cooley, in Cooley on Torts, Second Edition, page 768 *et seq.?*  Paraphrasing we say: *"His duty and his under- taking to his passengers go to this extent that, as far as human fore- sight and care can reasonably go, he will transport them safely.  He is not liable for injuries happening from sheer accident or misfortune where there is no negligence or fault, or where no want of caution, foresight, or judgment would prevent the injury."*

"If it be kept in mind that 'proof of a breach of duty is essential to a recovery in an action for negligence,' the doctrines stated by or inferred from the opinion of the court in Motchell vs. Marker, 62 Fed. Rep. 139, will serve for precedent here."

"The plaintiff relies on that case.  We take him at his word and we find that case decides:"

"1.    That elevators are not insurers of the safety of passengers."

"2.    That the highest degree of care is required of such owners."

"3.    That this care includes the control and management of the ap- paratus as well as the apparatus itself."

"4.    That it is the duty of the operative 'to see that all his passen- " gers are on and to give them sufficient time to adjust themselves.' "

"These four propositions, it is clear, properly state the law.  The three first are general rules, applying always, everywhere, to elevator owners as such.  The fourth proposition attempted to be applied calls for facts.  It raises the question, 'did the one operating the elevator give the passengers reasonable opportunity to obtain balance upon entering the car, before beginning the flight upward?' "

"If this question be answered in the affirmative, the plaintiff's case falls. What other answer can possibly be given upon the facts established here?".

"It is indisputable that the plaintiff and his brother-in-law, two healthy and vigorous looking, stocky built, fellows, apparently about thirty-five years of age, enter the elevator in the usual way, take their places about the center of the car—the messenger boy is in one corner, the operator is between them and the door. The operator closes the shaft door, looks to see if he is due to start upward, pulls his power rope as usual, turns to take the instructions of his passengers and finds one of them fallen on the floor and the accident has happened. Neither of the other passengers is jarred or startled or loses his equilibrium."

"Where is a breach of duty shown by these facts?"

The granting, by this court, of a rehearing evidenced the fact that we were not thoroughly satisfied as to the correctness of the conclusions reached by us and announced in the original opinion rendered. We have had the benefit, a second time, of argument, and the record has been submitted for re-examination after counsel of each side had called our attention to everything that could be said in favor of their respective clients.

## OPINION.

There were four persons in the elevator at the time of the accident, John Bernard, the elevator operator, James Devine, a messenger boy, Santo Russo, the party injured, and Alexander Siacca, his brother-in-law.

The plaintiff is very consistent and positive in his statement as to how the accident occurred. He testified that he entered the elevator with his right foot; that he then carried forward his left foot, but before he could place it securely upon the floor, the operator pulled the rope and the elevator moved upward so suddenly and with such rapidity as to throw him off his balance and throw his arm and shoulder against the side of the wall; that the flooring of the second story extended beyond the wall itself so as to almost reach outwardly the floor of the elevator; that his shoulder and arm being carried swiftly upward along the wall finally reached the projecting floor above, and striking the same with great violence, were at once crushed. It is true that he was not very precise in his description of the elevator and its surroundings

or exact as to how he was injured, but it was not to be expected that he should be thoroughly informed on those points, under the circumstances.

Divine, the messenger boy, testified that the elevator started off and went up fast; it went so fast that the man went right off his feet, and when he hit the second floor, the elevator boy stopped and brought the man down; that he did not know what it was that made Russo fall over, but it looked like the elevator went so fast that it made him fall over; it started fast and quick. It started with a jerk and went fast.

On cross-examination he stated that the elevator did not start that day differently from what it did usually; that it seemed to him that this was the first time that this man was in an elevator. As soon as the elevator started, he went down "like that;" the elevator went so quick. He testified further that neither he himself, nor the operator, nor the other man, Siacca, who was with Russo, fell or staggered. He does not seem to have noticed or known whether Russo had or had not placed his feet to the floor of the elevator when it started.

Siacca, the brother-in-law of Russo, preceded him in the elevator, and was unable to make any statement as to whether the latter had yet planted his left foot to the floor when the elevator started. He did state that, a moment after they got into the elevator, Russo's arm was caught; "that the elevator started as fast as possible; almost as fast as lightning."

Bernard, the elevator operator, stated that there were four elevators in the Hennen Building, operated side by side facing Common street; that the elevator in which the accident occurred was elevator No. 4— that nearest Carondelet street. The rule for operating these elevators, with reference to each other, was that the doors should be closed before starting; that the elevators were not supposed to go up all at once, or go down all at once; they were supposed to be divided between three or four floors. That the signal to start was sometimes given by a "starter;" that on this particular occasion the starter was not present; that he ascertained the time to start from the relative positions of the elevators; that he always looked up to see if the other elevators were at the right place; that he looked first, shut the door, and then pulled the rope. The witness referred to Russo's position in the elevator as being behind him, but he does not pretend to deny Russo's statement, that when the elevator started he had not yet planted his second foot upon the floor of the elevator; it is evident he had not noticed his situation specially as to this.

His version of the starting of the elevator was that he looked up to see the elevators coming down; that he closed the door as usual and started to pull the rope; that as he pulled the rope he looked around to see where the passengers were going, and he saw the stout man (Russo) fall and he immediately stopped the elevator and saw the stout man with his arm crushed between the ceiling of the second floor and the floor of the elevator; that he started the elevator that day as he usually did, with ordinary passengers. In another portion of his testimony he stated that "he was standing in the elevator at his place and two men and a boy came in the elevator; the two men stood behind and the boy opposite to him (the elevator man); *that he looked to see if it was time to start and as it was time to start* he closed the door and started the elevator and looked around to enquire where the passengers were going, what floors, and he saw the stout man fall and he immediately stopped the elevator, and he saw the man with his arm crushed at the ceiling of the second floor between the flooring of the elevator and the ceiling."

A comparison of the testimony of the different witnesses, satisfies us that Russo's statement that the elevator was started before he was permitted to place himself securely on his feet, is correct; that the elevator operator took as his guide, in starting it, the relative positions of the elevators themselves, rather than the situation and the condition of the passengers, who had entered his own elevator.

Defendant insists, however, that even if the elevator was started before Russo had both feet planted on the floor, it was impossible for the operator to have started it so suddenly, and with such swiftness, as to have thrown him off his balance. It says this matter is controlled by the engineer and is beyond that of the operator. That matters are so arranged that it is impossible for the elevator to be moved beyond a certain degree of swiftness, one hundred and fifty feet a minute, and an attempt to have it move faster would result in its being locked. That may be, and doubtless is true, but none the less the rate of speed at which the elevators are made to start, and are made to run, after starting up, to and within this maxim speed, is at the will of the operator.

Florence, defendant's engineer, being questioned on this subject, stated that the elevator boy could not regulate the speed, past the (maximum) excess, at full speed. That that was the limit of the elevator man's power; he might open the valve half way and crawl, but at full speed he can go no faster. Being asked "will the elevator start

with that speed regulation or that speed maximum when it starts, will it start with a jerk or start easily and safely?" He replied: "From a standstill to that velocity, it is not an easy gradual motion, but it starts right off at full speed." .

On cross-examination he was asked: "Supposing the rope was pulled so as to open the valve only partially, what is the slowest speed at which the boy might operate it?" To this he answered: "He might take all day to go to the eleventh story; the minimum might be brought down so that it would take him all day to go from the ground floor to the eleventh. If the elevator man opens the valve at starting, at full speed, it starts at the rate of one hundred and fifty feet a minute."

The operator himself confirms the statement. In answer to a question by one of the jurors as to whether it was possible for him to regulate the speed of the elevator by the rope, that is, to make it go faster or slower, he replied: "Well, if I see any one in a dangerous condition, like old people or women, I could pull the rope slowly or easily and that would cause the elevator to go slow." The regulation of the elevator is by pulling the rope and letting it go; he could control the speed of the elevator by the rope; if he pulled the elevator rope a certain distance lightly, it will go gradually; by giving one pull it would send it as fast as it would go; he could make the elevator go slower or faster by pulling easy, by not opening the valve to its full extent, but if he pulled the valve open to its full extent it goes as fast as it can. On this particular occasion, when he first started the elevator, he pulled the rope so as to open the valve to its full extent.

The case before us is that of a passenger in an elevator, who was unquestionably injured before reaching his destination, while being conveyed by a common carrier company. The plaintiff had a verdict in his favor in the lower court, which was approved by the district judge. Both sides produced their evidence. A thorough re-examination of the record satisfies us we would not be justified in saying that there was error in the verdict and in the judgment of the court, and unless we be able to so declare, we should not set aside the verdict and reverse the judgment.

We are of the opinion that the judgment heretofore rendered by us in this case should be, and it is hereby set aside, and it is now ordered, adjudged and decreed that the judgment appealed from be and the same is hereby affirmed.

MONROE, J., recuses himself having decided this case in the court of first instance.